UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY MORRIS,
Plaintiff,
v.
WELLS FARGO & COMPANY, et al.,
Defendants.

Case No. 23-cv-03277-HSG

**ORDER DENYING MOTION TO CERTIFY CLASS AND TERMINATING AS MOOT MOTION TO EXCLUDE EXPERT TESTIMONY**

Re: Dkt. Nos. 151, 152, 170, 188, 189

Pending before the Court are Plaintiffs' motion for class certification, Dkt. No. 151, Defendants' motion to exclude the expert opinion of Christopher Milner, Dkt. No. 170, Plaintiffs' motion to supplement the record, Dkt. No. 188, and Plaintiffs' motions to seal. Dkt. Nos. 152, 189. The Court held a hearing on the motions on May 28, 2026. *See* Dkt. No. 191. For the reasons discussed below, the Court **TERMINATES AS MOOT** Defendants' motion to exclude, Dkt. No. 170, **GRANTS** Plaintiffs' motion to supplement the record, Dkt. No. 188, **DENIES** Plaintiffs' motion for class certification, Dkt. No. 151, and **DENIES** Plaintiffs' motions to seal. Dkt. Nos. 152, 189.

## I. BACKGROUND

### A. Defendants' Policy History

Defendant Wells Fargo & Company is the parent company of Defendant Wells Fargo Bank, N.A. (the "Bank"). Dkt. No. 171-18 ¶ 2 ("Hunt Decl."). The Bank offers mortgage loans through Wells Fargo Home Mortgage. *Id.*

A standard feature of a mortgage loan is a rate lock, which allows a borrower to secure an interest rate for a fixed period (varying between 15 and 90 days) while the loan processes and the transaction closes. Dkt. No. 152-4 ("Hunt Tr.") at 34:17–40:3. If the transaction does not close in that period, the borrower risks losing the rate unless the period is extended, which requires

payment of a rate lock extension fee ("RLEF"). *Id.* The industry norm is that RLEFs are assessed based on fault: if the borrower causes the delay, the borrower pays the RLEF, but if the bank creates the delay, the bank covers the fee. Hunt Tr. at 42:12–17.

Before May 1, 2006, Wells Fargo maintained a policy of granting a five business-day extension at no cost to the borrower, without regard to which party caused the delay. Hunt Decl. ¶ 3. Other than the free five-day extension, the Bank's policies were silent on whether the Bank or the borrower would pay a rate lock extension fee. *Id.* ¶ 4. The policies were amended effective May 2006 to provide that "Fees charged by the Retail Repricing Group must be paid by the borrower, the branch or the regional office (whichever is appropriate)." *Id.* ¶ 4 n.1; Hunt Tr. at 72:8–73:4. Jill Hunt, an Executive Director for Wells Fargo Home Mortgage, testified that this did not amount to a material change in policy. Hunt Decl. ¶ 1; Hunt Tr. 72:25–73:5. Before September 16, 2013, there was no company-wide policy for determining appropriateness: that assessment depended on who was the primary cause of the closing delay, but there was no policy about how to determine the primary cause. Hunt Decl. ¶¶ 5–6; Hunt Tr. 85:3–8. The primary cause of delay was determined based on the judgment and experience of individual bank employees.

Between May 1, 2012 and September 15, 2013, Wells Fargo absorbed all RLEFs regardless of who was at fault for the delay. Hunt Decl. ¶ 10; Hunt Tr. at 42:18–25. During that period, the Bank expected its application volume to increase due to low interest rates and lacked sufficient staffing to close loans within the lock period. Hunt Tr. 132:13–19.

The bank implemented a new RLEF policy effective September 16, 2013, which required bank employees to assess RLEFs on a borrower when the delay in closing was caused by the borrower. *See generally* Dkt. No. 171-5. A later review of 276 loans between December 1, 2016 and February 28, 2017 revealed that this policy was inconsistently applied. Dkt. No. 152-8.

On April 20, 2018, the Bank entered into a consent order with the Office of the Comptroller of Currency and the Consumer Financial Protection Bureau. Under the order, the Bank implemented a remediation program for all covered borrowers who may have wrongly been charged RLEFs between September 16, 2013 and February 28, 2017. Dkt. No. 171-6 at 23:12–

24:12, 44:8–17 ("Pinkerton Tr."). The Bank conducted a second round of remediations for loans that closed before September 16, 2013 due to concerns that the Bank may have assessed an RLEF when the borrower was not at fault. Dkt. No. 152-12. The Bank sent a form letter to every individual who paid RLEFs. The letter explained the refund, which included principal, accrued interest, and an additional amount "to compensate you for the time you did not have these funds." *See* Dkt. No. 152-3 at 2, 5.[1]

**B. Morris' Mortgage**

Plaintiff Anthony Morris contends that he was wrongly charged RLEFs because Wells Fargo's delays caused him to miss closing deadlines. *See* Dkt. No. 151 ("Class Cert. Mot.") at 22–23. Morris applied for a 203(k) rehabilitation mortgage on March 23, 2005 that was set to close on May 23, 2005. Dkt. No. 171-2 at 2; Dkt. No. 171-29 at 2. By the closing date, Morris was required to fulfill conditions outlined in his commitment letter. Hunt Decl. ¶ 12.

When the closing date passed without any action by Morris, the Bank gave him a free five-day rate lock extension. *Id.*; Dkt. No. 171-29 at 8 ("SPECIAL EXT 5DAY 5-31/NC" granted on May 24, 2005). The Bank emailed and "tried to reach [Morris], [but] had to leave a message." Dkt. No 171-29 at 8. The Bank did not receive a response. *Id*. The Bank then moved the rate lock expiration date to June 30, 2005 and assessed an RLEF. Hunt Decl. ¶ 13; Dkt. No. 171-29 at 8–9. But because his lock period had already expired, Wells Fargo's system treated Morris' application as a new application, causing another origination fee to be assessed. Hunt Decl. ¶ 14. The Bank covered the second origination fee so that Morris would not have to pay two origination fees at closing. *Id.* ¶ 14; Dkt. No. 171-29 at 9 ("RELOCK AT 5.5 FOR 30 DAYS, 1 ORIG FEE COVERED BY BRANCH"). By June 27, 2005, Morris had still not satisfied the closing conditions, and the Bank provided him an additional free five-day extension. Hunt Decl. ¶ 16; Dkt. No. 171-29 at 10 ("SPEC EXT 5 DAYS TO 7/11"). Morris did not fulfil the closing conditions on July 11 or July 26, which resulted in two 15-day rate lock extension fees being assessed to Morris. Hunt Decl. ¶¶ 17–18. Morris' HUD-1 Settlement Statement reflects that he

[1] For ease of reference, the Court refers to the PDF pages rather than the document's internal pagination otherwise noted.

was assessed rate lock fees totaling $4,087.13, and the Bank provided lender credits totaling $3,521.13. *Id.* ¶¶ 19–21.

In November 2021, the Bank issued Morris a refund that included principal ($4,087.13), interest ($1,410.21), and an additional amount to compensate Morris for the time he did not have the funds ($1,307.68). Dkt. No. 152-3 at 2. Morris contends, and Wells Fargo does not contest, that this amount did not include disgorgement of Wells Fargo's investment returns. Dkt. No. 56 ¶¶ 4–5, 10; Dkt. No. 171 at 35–36.

### C. Procedural Posture

Plaintiffs sued Wells Fargo in San Francisco Superior Court on May 23, 2023. *See* Dkt. No. 1-1. Wells Fargo removed the case to this Court on June 30, 2023, Dkt. Nos. 1, 8, then moved to dismiss the complaint. Dkt. Nos. 19, 52. The Court found Plaintiffs adequately pled the conversion and quasi-contract claims, but dismissed the remaining count. Dkt. No. 56 ("Am. Compl."); Dkt. No. 70 (order granting in part and denying in part motion to dismiss).

Plaintiffs now move to certify two classes.[2]

The "Nationwide Conversion Class" consists of:

> All persons in the United States who paid a Rate Lock Extension Fee to Wells Fargo prior to September 16, 2013, in connection with a residential mortgage loan, and who received a refund check from Wells Fargo on or after October 6, 2019, where Wells Fargo was responsible for the Rate Lock Extension Fee under its own policies.

Class Cert. Mot. at 10.

The "New York Unjust Enrichment Class" consists of:

> All persons in the State of New York who paid a Rate Lock Extension Fee to Wells Fargo prior to September 16, 2013, in connection with a residential mortgage loan, and who received a refund check from Wells Fargo on or after October 6, 2016, where Wells Fargo was responsible for the Rate Lock Extension Fee under its own policies.

*Id.* Wells Fargo opposes the motion, Dkt. No. 171 ("Class Cert. Opp."), and moves to exclude Plaintiffs' expert, Christopher Milner. Dkt. No. 170 ("Mot. to Exclude"). Plaintiffs replied to Wells Fargo's opposition, Dkt. No. 182 ("Class Cert. Reply"), and opposed the motion to exclude.

---

[2] Plaintiffs filed two administrative motions to seal another party's materials, Dkt. Nos. 152, 189, to which Wells Fargo did not file a response. Civil Local Rule 79 5(f)(3). The Court **DENIES** the motion to seal and **ORDERS** Plaintiffs to file unredacted versions of the provisionally sealed materials on the public docket within seven days of this order.

Dkt. No. 174 ("Mot. to Exclude Opp."). Wells Fargo replied in support of its motion to exclude. Dkt. No. 181 ("Mot. to Exclude Reply").

After briefing concluded, Plaintiffs filed a motion to supplement the record with two documents they contend were recently produced. Dkt. No. 188. Those documents indicate that Wells Fargo sought to use a methodology similar to the one proposed by Plaintiffs' expert to determine which borrowers paid an RLEF when Wells Fargo caused the delay in closing. Dkt. Nos. 189-2, 189-3. Wells Fargo's methodology determined that at least 48,707 borrowers before September 2013 paid RLEFs but should not have. Dkt. No. 188 at 9. Wells Fargo did not oppose the motion but made arguments based on the documents. Dkt. No. 195.

On May 28, 2026, the Court held a hearing on the motion for class certification and motion to exclude. Dkt. No. 191, Dkt. No. 194 ("Hr'g Tr.").

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions, including the issue of class certification. Class certification is a two-step process. To warrant class certification, a plaintiff "bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("A party seeking class certification must affirmatively demonstrate [her] compliance with the Rule . . . .").

Rule 23(a) provides that a district court may certify a class only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022). The plaintiff bears a burden of proving by a preponderance of the evidence that

the Rule 23 prerequisites are satisfied. *Olean*, 31 F.4th at 664–65 & n.6.

If the four prerequisites of Rule 23(a) are met, a court also must find that the plaintiff "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Rule 23(b)(3) applies where there is both "predominance" and "superiority," meaning "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To determine whether a putative class action satisfies the requirements of Rule 23(b)(3), courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

The Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (citing *Dukes*, 564 U.S. at 350–51); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[A] district court must consider the merits if they overlap with the Rule 23(a) requirements."). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.*, 568 U.S. at 466. At bottom, the issue to be decided on a certification motion is whether the case should be "conducted by and on behalf of the individual named parties only" or as a class. *Dukes*, 564 U.S. at 348.

## III. DISCUSSION

The Court evaluates whether Plaintiffs have met each of the requirements of Rule 23(a) by a preponderance of the evidence.[3] Then, when Plaintiffs seek monetary damages on behalf of a

[3] There is no dispute that the putative class would contain at least 40 people, such that the

class, the Court considers whether they have proven that they satisfy the Rule 23(b)(3) requirements of predominance and superiority. *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1201 (9th Cir. 2024).

**A. Common Questions of Law or Fact**

Rule 23(a)(2) certification requires a finding of "questions of law or fact common to the class." Fed R. Civ. P. 23(a)(2). This requirement has "been construed permissively, and all questions of fact and law need not be common to satisfy the rule." *Ellis*, 657 F.3d at 986 (internal quotation marks and alteration omitted). Instead, "for purposes of Rule 23(a)(2), even a single common question will do." *Dukes*, 564 U.S. at 359 (alteration and quotation marks omitted). A question is sufficiently common where "it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350. Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008). "What matters to class certification . . . is not the raising of common 'questions'— even in droves—but rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S at 350 (emphasis omitted).

Plaintiffs contend that "Wells Fargo's uniform policy violations and unjust retention of RLEF profits raise common questions," which include

> (a) whether Wells Fargo unlawfully took and retained monies belonging to Plaintiff and Class members; (b) whether Wells Fargo should have, but did not, refund all profits they obtained on monies unlawfully taken and retained; (c) whether Wells Fargo's retention of benefits conferred by Plaintiff and Class members was inequitable; (d) whether Wells Fargo is liable to Plaintiff and Class members for conversion; and (e) whether Plaintiff and Class members are entitled to disgorgement from Wells Fargo and the amount of such disgorgement.

Class Cert. Mot. at 21. Plaintiffs argue that all of these questions may be resolved in "one stroke" for the putative classes' claims. *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

---

numerosity requirement is satisfied. *See* Fed R. Civ. P. 23(a)(1); *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 606 (N.D. Cal. 2014). The proposed nationwide class allegedly contains over 350,000 individuals, making joinder impracticable. *See* Class Cert. Mot. at 20.

(2011)). Wells Fargo counters that no common evidence will resolve the questions that Plaintiffs raise, since all of the common questions hinge on the individual circumstances of the RLEFs. Class Cert. Opp. at 21–22.

The Court finds at least one common question of law or fact. Since the classes are defined as "All persons . . . who paid a Rate Lock Extension Fee to Wells Fargo. . . where Wells Fargo was responsible for the Rate Lock Extension Fee under its own policies," whether Wells Fargo inequitably retained a benefit conferred, whether Wells Fargo made profits from those funds, and whether Wells Fargo would be required to disgorge those amounts are questions common to all the class members.

The Court finds that Plaintiffs have met the low threshold for commonality. *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 543 (9th Cir. 2013); *Kihn v. Bill Graham Archives, LLC*, 445 F. Supp. 3d 234, 246 (N.D. Cal. 2020) (describing commonality as a "low bar").

**B. Typicality**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984 (internal quotation omitted). "Typicality focuses on the class representative's claim . . . and ensures that the interest of the class representative 'aligns with the interest of the class.'" *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Under the "permissive standards" of Rule 23(a)(3), the claims need only be "reasonably co-extensive with those of absent class members," rather than "substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In other words, typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quotation omitted). "The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–158 & n.13 (1982). However,

typicality concerns whether a plaintiff is a proper party to proceed with the suit. *Id.*

Plaintiffs contend that Morris's claims are "reasonably co-extensive with those absent class members," since he alleges that Wells Fargo was at fault for his delay in closing, Wells Fargo charged him an RLEF, mailed him a refund, and wrongfully retained profits. Class Cert. Reply at 22 (citing Am. Compl. ¶¶ 34–39). Morris asserts the same legal theory as the rest of the class and alleges the same course of conduct by Wells Fargo caused him to incur an injury. Am. Compl. ¶¶ 34–39. Wells Fargo argues that Morris' claims are subject to unique statute of limitations defenses, which he seeks to avoid by invoking several individualized tolling doctrines. Class Cert. Opp. at 37–38.

The Court finds that Wells Fargo's statute of limitations argument is not the type of defense that raises "a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Belyea v. GreenSky, Inc.*, No. 20-cv-1693-JSC, 2025 WL 589037 at * 19 (N.D. Cal. Feb. 24, 2025) (quoting *Hanon*, 976 F.2d at 508). "Thousands of class members who originated loans [during the proposed class period] will be subject to the same defenses. Nor is [Morris'] basis for tolling the statute of limitations unique to [him]." *See id.* As Plaintiffs argue, the fault and notice arguments are shared across the class. Class Cert. Reply at 22 (discussing *Hanon*, 976 F.2d 497). While Morris pleads that he only discovered Wells Fargo's potential liability when he received his refund letter, Plaintiffs also plead that other class members "did not and could not discovery Wells Fargo's willful misconduct until receiving their individual refund letters." Am. Compl. ¶ 69. The arguments in favor of tolling the statute of limitations do not meaningfully differentiate Morris' claims from those of the class.

The Court finds that Plaintiffs have met the "permissive standard" applicable for typicality.

### C. Adequacy

Rule 23(a)(4) requires that the "representative parties will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court must address two legal questions: (1) whether the named Plaintiff and his counsel have any conflicts of interest with other class members; and (2) whether the named Plaintiff and his counsel will prosecute the action vigorously on behalf of the class. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).

For the proposed representative to fulfill those requirements, he must also be a member of the class. *Falcon*, 457 U.S. at 156; *Sali v. Corona Regional Med. Ctr.,* 909 F.3d 996, 1007 (9th Cir. 2018) (affirming district court decision that representative plaintiff was inadequate because "she is not a member of any class she seeks to represent"), *rehr'g en banc denied*, 907 F.3d 1185.

Plaintiffs defined the classes to require that "Wells Fargo was responsible for the Rate Lock Extension Fee under its own policies." For purposes of class certification, Plaintiffs carry the burden of showing that Morris was wrongly assessed an RLEF. *White*, 104 F.4th at 1201 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)).

Wells Fargo presents substantial evidence indicating that Morris was not wrongly assessed an RLEF. It submitted a declaration with supporting documentation showing that Morris was at fault for the delays in his closing. *See* Dkt. Nos. 171-18, 171-29, 171-30. Morris' loan file and HUD-1 Settlement Statement show that Morris did not complete the closing conditions after multiple deadlines passed, that Wells Fargo reached out to Morris in an effort to avoid imposing RLEFs, and that Wells Fargo absorbed some fees, even when it was not at fault. *See supra* § I-B.

Plaintiffs do not support Morris' version of the events with any additional documentary evidence. *See* Class Cert. Mot. at 12, 17; Class Cert Reply at 22. In reply, Plaintiffs do not contest any of Wells Fargo's contentions, instead arguing that it would be inappropriate for the Court to "resolve disputed factual inferences against the complaint" when the Court did not do so on the motion to dismiss. Class Cert. Reply at 22 (citing Dkt. No. 70 at 5–6). But this argument is wrong as a matter of law: unlike at the motion to dismiss stage, in deciding a class certification motion, the Court must engage in a "rigorous analysis" of the evidence, not the complaint. *Dukes*, 564 U.S. at 351 (quoting *Falcon*, 547 U.S. 147 at 161).

The Court finds for purposes of class certification that Morris has not shown that he was wrongly assessed an RLEF. It follows that he is not a member of the putative classes, and therefore is an inadequate class representative. *See Sali*, 909 F.3d at 1007; *Falcon*, 457 U.S. at 156 (named plaintiff with discriminatory promotion claim could not represent absent class

members with discriminatory hiring claims, since he was not a member of that class).[4]

**D. Predominance**

To grant class certification pursuant to Rule 23(b)(3), the Court must also find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The commonality and predominance inquiries have significant overlap. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (explaining that "there is substantial overlap between" the tests for commonality and predominance); *Olean*, 31 F.4th at 664 (stating that "[t]he requirements of Rule 23(b)(3) overlap with the requirements of Rule 23(a): the plaintiffs must prove that there are questions of law or fact common to class members that can be determined in one stroke . . . in order to prove that such common questions predominate over individualized ones" (quotations and citations omitted)). The Supreme Court, however, has made clear that Rule 23(b)(3)'s predominance requirement is "even more demanding" than the commonality requirement of Rule 23(a). *See Comcast*, 569 U.S. at 34 (citing *Windsor*, 521 U.S. at 623–24).

Determining whether questions of law or fact common to the class members predominate begins with the elements of the underlying causes of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011); *see also Olean*, 31 F.4th at 666 (explaining that "to prove there is a common question of law or fact that relates to a central issue . . ., plaintiffs must establish that 'essential elements of the cause of action' . . . are capable of being established through a common body of evidence, applicable to the whole class"). Here, only Plaintiffs' conversion and quasi-contract claims survived the motion to dismiss, Dkt. No. 70, and both of those claims necessarily hinge on whether each borrower paid an RLEF when they should not have. *See* Class Cert. Mot. at 32–34; Class Cert. Opp. at 26–28; *Opperman v. Path*, 84 F. Supp. 3d 962, 989 (N.D. Cal. 2015) (citing *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066 (1998)) (defining conversion under California law as "(1) the plaintiff's right to possession or ownership of a property interest; (2) the defendant's conversion of the property by a wrongful act or

[4] Defendants do not identify grounds to contest proposed class counsel's adequacy. Class Cert. Opp. at 37–38.

disposition of property rights; and (3) damages"); *Nordwind v. Rowland*, 584 F.3d 420, 434 (2d Cir. 2009) (defining quasi-contract claim under New York law to require "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution"); *Astiana v. Hain Celestial Grp. Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (defining quasi-contract claim under California law to require that defendant was "unjustly conferred a benefit through mistake, fraud, coercion, or request").[5] As the parties acknowledged at the hearing, who was responsible for the assessment of the RLEFs at issue is the central issue in the case. Hr'g Tr. at 5:10–14 ("I think both parties have agreed from the briefing, . . . what will drive the litigation is whether the borrower paid an RLEF for which the Bank was responsible. Every other issue is either agreed to or is not disputed as a common issue."), 14:15–18 ("Liability here depends on whether Wells Fargo kept money that it wasn't entitled to because it made a profit off of these fees that it shouldn't have charged in the first place.").

The Court finds that the predominant inquiry—whether Wells Fargo unjustly benefitted or converted property at Plaintiffs' expense—hinges on whether Plaintiffs can show that common evidence establishes as to all class members who was responsible for the assessment of an RLEF. The Court finds that Plaintiffs have adduced no such classwide common evidence sufficient to meet their burden under the well-established rigorous standard.

**i. The Documentary Record Shows that Individual Inquiries With Respect to Plaintiffs' Theory Necessarily Predominate over Common Ones**

The evidence relevant to determining whether Wells Fargo or the borrower should have paid an RLEF is found in each putative class member's individual loan file, including the loan notes and HUD-1 Statement. The loan notes contain non-standard narratives tracing the course of each loan transaction. *See, e.g.,* Hunt Decl. ¶¶ 5-6; Dkt. No. 171-29 at 8–10. The HUD-1 Statement shows what fees the borrower actually paid. Hunt Decl. ¶ 15. Significantly, the loan notes do not contain standardized explanations for how Wells Fargo determined who was at fault for a delay when charging an RLEF. Hunt Decl. ¶ 5. Plaintiffs assert that "the loan notes

[5] The Court does not need to reach the choice of law issue framed by the parties. Class Cert. Mot. at 25–30; Class Cert. Opp. at 29–35.

themselves often evince responsibility to pay for the RLEFs," citing the notation "FEE COVERED BY BRANCH" and asserting that "[t]he only rational reading of that phrase is as Wells Fargo's admission of responsibility for that fee." Class Cert. Reply at 9. But that attorney argument does not meet Plaintiffs' predominance burden as to the critical question here, which is not whether a fee was paid but instead *why* Wells Fargo did or didn't pay any particular fee. That question can only be answered by reviewing each file and assessing the circumstances underlying each borrower's fee payments, and there simply is no common proof capable of answering this question as to every member of the class. *See* Hunt Decl. ¶¶ 6–7; Hr'g Tr. at 21:6–23 (discussing expert reports). Plaintiffs acknowledged at the motion hearing that determining responsibility for delay in closing a loan entails an individualized inquiry. Hr'g Tr. at 27:19–6 ("I don't dispute Your Honor's characterization of this analysis as individualized proof, it is—this is not common proof"), 29:9–11 ("admittedly an individualized issue").

The Court finds that on its face the documentary record here makes plain that individual, loan file by loan file inquiries as to the key question—who was responsible for the delay leading to each borrower being charged an RLEF?—substantially predominate over any common issues. *See Parducci v. AMCO Ins. Co.*, No. 18-cv-7162-WHO, 2021 WL 5908379 at *8 (N.D. Cal. 2021) (denying class certification for lack of predominance where determining whether a property was overinsured, and whether homeowner had notice, "would require a review of each class member's insurance file, including any conversations they had with their agent"); *Murfitt v. Bank of America N.A.*, No. EDCV 13-1182 JGB (SPx), 2015 WL 13306363 at *11 (C.D. Cal. 2015) (denying class certification for lack of predominance where individual inquiries regarding each borrower's mortgage loan package would be required to determine whether defendant bank "acted improperly by not responding within thirty days").

Plaintiffs argue that two district court cases support their predominance claim here. Hr'g Tr. at 7:3–13:7 (discussing *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666 (N.D. Cal. 2011) and *Bias v. Wells Fargo & Co.*, 312 F.R.D. 528 (N.D. Cal. 2015)); Class Cert. Reply at 11 (discussing *Herrera*, 274 F.R.D. at 673). They contend that "these cases stand for the proposition that a file-by-file review does not doom predominance for the plaintiffs as long as . . . the task is

United States District Court
Northern District of California

not 'daunting.'" Hr'g Tr. at 7:12–15 (quoting *Herrera*, 274 F.R.D. at 673). But the Court does not find Plaintiffs' argument, or its reliance on these non-binding cases, persuasive.

In *Herrera*, the court found that the predominant question was "whether the communications sent by [Defendant] violate the [Fair Debt Collection Practices Act]," and there appears to have been no dispute that all class members received those communications. 274 F.R.D. at 680. While the court acknowledged that it might be necessary to "conduct some individualized inquiry to determine the limits of the class," including confirming the type of loan, determining whether the property was foreclosed, and determining whether the class member occupied the property, it found those inquiries did not predominate over the "central question" regarding the legality of the common communication. *Id.* And in *Bias*, the court actually denied certification of an unjust enrichment claim because material variances in each state's law would predominate and the element of reliance on a misrepresentation could not be presumed. 312 F.R.D. at 540. The *Bias* court did certify a civil RICO class, but the basis for that decision was that reliance on uniform misrepresentations could be presumed "without individual inquiry." *Id.* at 540–42.[6]

This case is different. Plaintiffs' claim here does not hinge on an undisputedly common representation made across the class. Instead, there is no common proof that can establish on a classwide basis who bore responsibility for a delay that resulted in each class member being charged an RLEF. This reality means that the proposed class cannot be certified.[7]

---

[6] Plaintiffs also rely on *Peel v. BrooksAmerica Mortgage Co.*, No. 8:11-cv-0079-JST (RNBx), 2012 WL 3808591 (C.D. Cal. 2012) in their reply. Class Cert. Reply at 11. But that case does not help them for the same reasons discussed above: *Peel* involved a UCL claim based on uniform statements to class members that allegedly omitted material facts about the loans' true costs and terms. *Id.* at *1. Because individual class members did not have to show reliance, certification was appropriate since the case hinged on whether the uniform statements made to class members were actually false. *Id.* at *8. To the extent the *Peel* court discussed file-by-file review of individual loan files in the context of finding that the class was ascertainable, *id.* at *3, the Court finds that discussion irrelevant to the issue here, because the Ninth Circuit has since clarified that there is no stand-alone ascertainability requirement in Rule 23(a). *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017), *abrogated on other grounds by Healy v. Milliman, Inc.*, 164 F.4th 701, 709 (9th Cir. 2026).

[7] Plaintiffs argue that there is common proof because a "common set of records"—namely the loan files—exists. Class Cert. Reply at 11. But the fact that each file contains the same *type* of standardized documents does not transform the inherently individualized review of *loan-specific information* required to answer the key question for each borrower into classwide common proof.

**ii. Even Assuming it Could Survive Defendant's *Daubert* Challenge, Plaintiffs' Expert Testimony Does Not Eliminate the Predominance of Individual Issues.**

The Court tends to agree with Defendants that Plaintiffs' expert's analysis suffers from significant methodological flaws. But it does not need to reach those issues, or rule on Defendants' *Daubert* motion, because even on its face that analysis does not solve the predominance problem the Court identified above. *See Rusoff v. The Happy Group, Inc.*, --- F.4th ---, No. 24-7706, 2026 WL 2387098 at *6 (9th Cir. Aug. 17, 2026) (explaining that "plaintiffs may not obtain class certification—nor may defendants block it—through the presentation of expert witnesses who lack reliability").

**i. Plaintiffs' Expert Report**

Plaintiffs' expert Christopher Milner contends that he can "generate a list of identified defective loans and summary counts and preliminary estimates of the percentage of loans with (i) rate lock extension indicators and (ii) explicit statements reflecting Wells Fargo responsibility in the notes." Dkt. No. 152-15 ("Milner Report") ¶ 58. Milner proposes to do so using two methodologies, each of which relies on an unexecuted model.[8] Milner Report §§ VI–VII.

In the "Category 1" methodology, Milner used a python-based software script to analyze only loan notes and search for certain words to determine whether a rate lock extension fee was imposed ("lock extended," "extension," "re-lock"), and others to determine whether in his view the Bank admitted responsibility for delay ("covered by branch," "branch to cover," "Wells to cover"). *Id.* ¶¶ 5–6, 35, 52–56. Milner chose the "seed terms" based on a review of 25 sets of loan notes. Milner Report at 21. Milner explains that he would use this computer program to review the loan files of 1,000 of the 275,954 loans for which borrowers received refund checks. *Id.* ¶¶ 42–46. Milner contends that "[a]s designed, the [Category 1] methodology permits classwide analysis by applying the same objective criteria to all loans in the sample and, if appropriate, extrapolating the results to the full population subject to stated confidence intervals."

[8] The fact that an expert's model has not yet been executed is not by itself disqualifying at the class certification stage. But the Ninth Circuit has explained that "[t]o be sure, the fact the model has not been executed remains relevant." *Lytle v. Nutramax Labs, Inc.*, 114 F.4th 1011, 1032 (9th Cir. 2024).

*Id.* ¶ 10. In this methodology, Milner did not use the script to analyze the borrowers' HUD-1 statements, which show what fees they paid in closing their mortgage. *See generally* Milner Report § VI; Dkt. No. 171-36 ("Bryar Report") ¶ 73.

Milner also proposes a second Category 2 methodology, on the ground that the full data needed to execute the Category 1 methodology was not available when he prepared his report. *See* Milner Report ¶ 49 ("I have not yet implemented the Category 1 Methodology due to the current unavailability of the loan-level data"); Dkt. No. 174-2 at 156:11–15, 178:7–22. Under the Category 2 methodology, Milner asserts that if he had more loan files, he could create another program to review the entirety of those files, determine whether an RLEF was paid and decide whether Wells Fargo was responsible for the delay. Milner Report ¶¶ 11, 60–62. He indicates that he did not have a sufficiently large random sample to complete this methodology at the time of his report. *Id.* ¶¶ 11, 36.

**ii. Automating the Review of a Large Number of Individual Loan Files Does Not Eliminate the Predominance of Individual Issues**

Plaintiff argues that Milner's proposed computer-based review of the loan files establishes the predominance of common issues because it eliminates what would otherwise be a "daunting" physical file-by-file review. *See* Hr'g Tr. at 6:25–7:15 (citing cases for the principle that "a file-by-file review does not doom predominance for the plaintiffs as long as . . . the task is not daunting"); 28:1-3 (characterizing expert's methodology as "a method of dealing with those individualized issues in a way that minimizes their predominance and allows the common issues in this case to predominate and to prevail"). Even assuming (without deciding) that Milner's methodologies could do what he claims they can, that analysis suffers from the same predominance problems as a manual file review would, because the use of a computer program to review those files does not address the fundamental problem.

Milner admits that his Category 1 methodology cannot even determine whether a borrower actually paid an RLEF, *see* Dkt. No. 171-16 at 184:21–185:22. Instead, he reads the term "covered by branch" generally to reflect a determination that Wells Fargo found itself liable for an RLEF. Milner Report ¶ 54 ("primary seed term"). But as Wells Fargo's expert showed, as one



United States District Court
Northern District of California

example, in many loan files, it is impossible to distinguish an RLEF from other fees that the Bank covered. Dkt. No. 171-36 ¶¶ 75–78 ("A lender may 'roll' a rate-lock extension fee into an origination fee, *i.e.*, to make the rate-lock extension fee part of the origination fee."). And Wells Fargo presents evidence, consistent with common sense, that during the relevant period "the Bank was permitted to and did absorb a high number of what should have been borrower-assessed extension fees for customer service reasons." Hunt Decl. ¶ 11.

Additionally, the evidence reflects that there is no uniform coding in the loan files that would reliably indicate whether Wells Fargo or the borrower was responsible for the delay resulting in the imposition of an RLEF, so automating the review process does not solve the fundamental problem that this determination requires a detailed review of each loan file. *See* Dkt. No. 171-36 at ¶ 88 (explanation by Defendants' expert based on a review of a subset of loan files that "there is no search term that Mr. Milner can use to reliably identify delays caused by Wells Fargo" because "[t]he loan files do not include a data field that Wells Fargo used to record responsibility for delays," and the loan files do not "systematically memorialize an apportionment of blame for delays"). Put differently, individual issues will still predominate even under Milner's proposed automated approach.[9] Milner's own reply report effectively concedes as much: he says that his methodology "do[es] not depend on a single phrase in isolation," but instead identifies "internal lender-responsibility indicators that warrant further file-level confirmation." Dkt. No. 182-12 ¶ 11. Of course, "file-level confirmation" is another way of saying "individual substantive file-by-file review," and that review defeats predominance.

And the Category 2 methodology does nothing more than assert that Milner could eventually develop and execute a program that will provide the necessary information. *See* Milner

[9] Plaintiffs argue that "sampling and extrapolation" is allowed, citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016). Hr'g Tr. at 16:22–17:5. *Tyson* was a wage-and-hour dispute where the employer failed to maintain proper records, such that "[i]f the employees had proceeded with 3,344 individual lawsuits, each employee likely would have had to introduce [the sampling] study to prove the hours he or she worked." *Id.* at 456–57. By contrast, here Plaintiffs do not and cannot contend that each individual class member's loan file does not exist, or that each class member, in an individual case, could rely on Milner's report to establish liability. Instead, in any individual action, the focus would be an analysis of that particular plaintiff's loan file to determine who should have paid the RLEF. *See* Dkt. No. 169-36 ¶¶ 75–78.

Report ¶¶ 60–62. Simply asserting that an as-yet-entirely unformed methodology would solve the fundamental predominance problems here is not "useful in evaluating whether class certification requirements have been met." *Lytle*, 114 F.4th at 1031; *see also id.* (explaining that "where an expert's model has yet to be fully developed, a district court is limited at class certification to making a predictive judgment about how likely it is the expert's analysis will eventually bear fruit"). The Court cannot accept an expert's *ipse dixit* in lieu of actual analysis and explanation. *See Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 965 (N.D. Cal. 2025) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). So the Category 2 methodology does not add anything that helps Plaintiffs meet their predominance burden here.

Because common issues clearly do not predominate over individualized ones, the Court denies Plaintiffs' motion for class certification.[10] And because the outcome is the same even if the Court were to consider Milner's reports, the motion to exclude his testimony will be terminated as moot.

### E. Superiority

The superiority requirement tests whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court considers four non-exclusive factors: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *Id.* "Where classwide

[10] Two days before the class certification hearing, Plaintiffs filed an administrative motion to supplement the record. Dkt. No. 188. Wells Fargo does not oppose Plaintiffs' motion, and the Court **GRANTS** it. In the motion, Plaintiffs sought to draw the Court's attention to two documents in which Wells Fargo sought to create its own methodology for identifying borrowers who were charged RLEFs, but should not have been. *Id*. One document shows that Wells Fargo hired a consultant to analyze loan notes, and identified at least 48,707 affected borrowers. Dkt. No. 189-1 at 9; Dkt. No. 189-3 at 5–6. They argue that Wells Fargo's efforts show that Milner's methodologies meet the *Lytle* standard. Wells Fargo responds that it abandoned that plan because "it did not work," and instead decided to simply give a refund to every borrower who might have paid an RLEF. Dkt. No. 195 at 2. Nothing about these documents changes the analysis set out in this order.

litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d. 1227, 1234–35 (9th Cir. 1996).

Wells Fargo contends that Plaintiffs' proposed "trial by formula" approach does not resolve the superiority concerns because each class member's claim rises and falls on its own merits, and Wells Fargo would be deprived of defenses it has to any claim. Class Cert. Opp. at 39. Plaintiffs counter that each of the individual claims in this case is too small for effective individual litigation. Class Cert. Reply at 23. And since all of the relevant information is contained in standardized loan files, they assert that the relevant data is capable of "efficient calculation." *Id.* (citing *D.C. v. Cnty. of San Diego*, 783 F. App'x 766, 767 (9th Cir. 2019)).

Since Plaintiffs have not shown that liability can be determined without a file-by-file analysis, they have not shown by a preponderance of the evidence that class adjudication is superior.

* * * * *

The Court finds that Plaintiffs have failed to show by a preponderance of the evidence that typicality, adequacy, predominance, and superiority are satisfied. Fed. R. Civ. P. 23(a), (b)(3).[11] The motion for class certification is thus **DENIED.**

## IV. CONCLUSION

The Court **TERMINATES AS MOOT** Wells Fargo's motion to exclude, Dkt. No. 170, **DENIES** Plaintiffs' motion for class certification, Dkt. No. 151, **GRANTS** Plaintiffs' administrative motion to supplement the record, Dkt. No. 188, **DENIES** Plaintiffs' administrative motions to seal another party's materials, Dkt. Nos. 152, 189, and **ORDERS** Plaintiffs to file

[11] Plaintiffs request that the Court alternatively certify a Rule 23(c)(4) class. Class Cert. Mot. at 37. But the only specific issue Plaintiffs identify is the one the Court has already found not to be susceptible to common proof: "whether Wells Fargo improperly retained profits from its own wrongdoing and should disgorge the same." Class Cert. Mot. at 37. For that reason, the Court finds that certification of an issue class would not materially advance the disposition of the litigation as a whole, given the numerous individualized issues affecting determinations of liability. *Reitman v. Champion Petfoods USA, Inc.*, 830 F.App'x. 880, 882 (9th Cir. 2020) (citing *Valentino*, 97 F.3d at 1234).

unredacted versions of the provisionally sealed materials on the public docket within seven days of this order.

The Court further **SETS** case a case management conference on September 29, 2026, at 2:00 p.m. The hearing will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities. The parties are further **DIRECTED** to file a joint case management statement by September 22, 2026.

**IT IS SO ORDERED.**

Dated: September 9, 2026

HAYWOOD S. GILLIAM, JR.
United States District Judge